IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    **Plaintiff,**<br>vs.<br><br>ALBERTO GUTIERREZ-RUIZ,<br><br>                    **Defendant.** | **FINDINGS OF FACT,<br>CONCLUSIONS OF LAW,<br>AND ORDER**<br><br><br>**Case No.  2:10CR137 DAK** |

This matter is before the court on Defendant Alberto Gutierrez-Ruiz's Motion to

Suppress.  An evidentiary hearing on the motion was held on three days over the course of

several months:  August 20, 2010, October 8, 2010, and October 27, 2010.   After briefing by the

parties, closing arguments were heard on December 10, 2010.  At the hearings, Defendant was

represented by Scott C. Williams and Heather E. Harris.  The United States was represented by

Robert A. Lund.  Before oral argument, the court carefully considered all pleadings, memoranda,

and other materials submitted by the parties.  Since taking the matter under advisement, the court

has further considered the law and facts relating to this motion.  Now being fully advised, the

court renders the following Findings of Fact, Conclusions of Law, and Order.

**FINDINGS OF FACT**

**I.  The Traffic Stop**

On February 14, 2010, Utah Highway Patrol ("UHP") Trooper Charles Taylor stopped a

Dodge pickup on SR-191 for speeding.   After stopping, Trooper Taylor approached the driver's

window of the truck.   As the lone male occupant rolled down the window, Trooper Taylor

smelled a strong odor of air freshener, even though Trooper Taylor was in back of the truck, five

or six feet from the window.   After introducing himself and explaining the speeding violation,

Trooper Taylor asked to see a driver's license.  The driver handed the trooper a driver's license

from Sonora Mexico, identifying him as Alberto Gutierrez-Ruiz. The trooper then asked

Gutierrez if he possessed a United States driver's license, and Gutierrez said that he did not.

Gutierrez said that he lived in Mexico and that a person named "Israel" owned the vehicle.

Gutierrez then gave the trooper an envelope which contained an Arizona vehicle registration and

proof of insurance for the truck, both in the name of Israel Galaviz.

Trooper Taylor asked Gutierrez to return to the patrol vehicle with him. After a limited

pat down, Gutierrez settled in the front passenger seat of the patrol car.  Trooper Taylor observed

that Gutierrez spoke little English but understood the requests to produce a driver's license and

registration, to exit the truck, and to return to the patrol car.   While in the patrol car, Trooper

Taylor obtained a Mexican voter registration card from Gutierrez.  Trooper Taylor then asked

dispatch to run a check on the status of the truck, possible warrants, and for an Arizona license.

While he waited for the information, Trooper Taylor called Officer Cal Dean Black of the

Blanding Police Department to provide Spanish translation via cell phone.   After speaking with

Gutierrez on speaker phone, Officer Black reported that Gutierrez was from Mexico and on

vacation to see a baby in Colorado Springs.[1] *See* Gov. Exhibit 3.

---

[1] This information was elicited during the traffic stop and can be found in the videotape
of the stop. *See* Gov. Exhibit 3.

While Trooper Taylor waited for dispatch to complete the checks on the vehicle, driver's license, and warrants, he deployed Kilo, a certified narcotic-detection dog, around the truck. Kilo conducted an exterior sniff of Gutierrez's truck, focusing intensely on the front driver's side. Trooper Taylor testified that this was an alert by Kilo.[2] Subsequently, Kilo began to vigorously scratch and bark by the driver's side door, an indication of the presence of illegal drugs.[3] Since dispatch had not yet responded to the informational requests, the dog sniff did not extend the length of the detention associated with the original traffic stop.

After the dog's indication, Trooper Taylor conducted a search of the truck by examining all the obvious, open areas in the vehicle. As he continued to search, he lifted the hood of the vehicle and could see that the plastic grill below the windshield had been polished and was unusually clean, as if it had been "Armour All'd." Through the cowling slots, the trooper noticed green rope and packaging. The trooper recognized the packaging as consistent with the packaging of illegal drugs he had observed in the past.

After placing Gutierrez into custody, Trooper Taylor removed the cowling, and he could

---

[2] The cowling area is essentially the area underneath the bottom of the windshield to the hood. Underneath the cowling, there is a void compartment that contains the windshield wiper motor.

[3] Defendant, through his expert, Steven Nicely, contends that Kilo's alert was unreliable and cannot support a finding of probable cause. Mr. Nicely testified that Kilo was cued or prompted by his handler, Trooper Taylor. Having watched the video and listened to and reviewed the testimony of Trooper Taylor, Sergeant Hull, and Sergeant Wendell Nope, in addition to the testimony of Mr. Nicely, the court credits the testimony of Taylor, Hull, and Nope and therefore disagrees that Kilo was cued or prompted; rather, the court finds that Kilo made a reliable alert and then a more specific indication.

see multiple packages concealed in the firewall of the engine compartment. The packages were wrapped in black electrical tape, with one being tied with florescent green rope. At Trooper Taylor's request, another trooper drove the truck to the San Juan County Jail. After arriving at the jail, Trooper Taylor removed several packages containing a total of six pounds of heroin and one pound of methamphetamine. Laboratory tests later confirmed those results.

## II. Qualifications of Kilo and His Handler, Trooper Taylor

Trooper Taylor completed extensive training requirements and became a certified canine handler on February 22, 2008. The certification standards in the state of Utah comprise the toughest in the country. A canine handler certification remains valid for life unless the handler leaves the canine program for a year or more. Trooper Taylor has not left the program since his certification. Trooper Taylor partnered with Kilo in October of 2009, and they certified as a team on December 3, 2009, three months prior to the traffic stop at issue on February 14, 2010.

Kilo, however, entered the canine program in 2006. During his career, four different handlers have worked with Kilo. All three prior handlers, Rob Nixon, Todd Hull, and Rod Elmer, were certified handlers and were certified as a team with Kilo. Similarly, the judges who certified Kilo and all four handlers also hold certifications establishing their qualification to fulfill that responsibility. Since entering the canine service program, Kilo's certification has never lapsed.

Kilo has a proven track record of reliable performance as a drug detection dog. Because Kilo possesses an unusually sensitive nose, he consistently scores well higher than most dogs in the program. As demonstrated by the performance logs, Kilo has an excellent track record.

4

Between October 2009 and February 14, 2010, Kilo conducted 111 sniffs only 6 of which were deemed "unsuccessful" indications. That equates to a successful rating of 95%. As documented in the performance logs, between February 14, 2010 and the date of the suppression hearing, Kilo conducted 162 sniffs only 4 of which were scored as "unsuccessful" indications. That equates to a successful rating of 98%.[4]

Moreover, the method of scoring unsuccessful deployments applies a very critical standard because it is unknown whether a non-visible residual amount of drugs existed in the location. It is possible that an unsuccessful rating may have been successful because dogs can detect the presence of drugs when there is no measurable quantity. Additionally, Trooper Taylor inadvertently omitted the results of 11 deployments from the performance logs. However, Trooper Taylor scored only one of those deployments as unsuccessful. Therefore, adding those additional numbers would have only increased Kilo's successful rating. In regard to the instant case, Trooper Taylor testified that he did not cue Kilo to alert, that Kilo is not a prompt-dependent dog, and the resulting indication was reliable. The court agrees.

In addition to Trooper Taylor, the government called two expert witnesses, Sergeant Wendell Nope and Sergeant Todd Hull. Sergeant Wendell Nope created the canine program at the Utah Department of Public Safety's police academy and he has headed that program since 1989. He is a well-respected expert in the field and he has testified at least 50 times as an expert

---

[4] The court recognizes that Trooper Taylor's records were not a model of completeness or thoroughness. However, given the credibility of the government's three witnesses as to Kilo's past reliability record, the court finds that the records are sufficient enough to substantiate Kilo's training and history of reliability.

in the court regarding the performance of drug detection dogs. In his professional capacity, Sergeant Nope has observed Kilo for several years in numerous training scenarios. Sergeant Nope knows Kilo as a high-energy dog with very sensitive nose. Despite his high energy disposition, Sergeant Nope testified that Kilo remains a very reliable drug dog.

The police academy rates every dog during the certification process on a scale of between 1 and 6, 1 being high and 6 being low. Kilo consistently rates in the range of 1.6 to 1.8, a rating corresponding to "commendable performance." The average dog in the program achieves a rating of about 3. Despite his already high scores, Kilo doesn't score even higher because of his somewhat hectic searching technique. Although his rambunctiousness does negatively affect his scores, that high energy quality does not reduce his reliability as a drug detection dog in the field.

Similarly, Sergeant Nope has had occasion to view Trooper Taylor in training scenarios. Sergeant Nope also reviewed handler performance reports related to Trooper Taylor and Kilo, and Trooper Taylor consistently received glowing reports from his chain of command and his colleagues regarding his competence as a canine handler. Additionally, in order to view Trooper Taylor working as a team with Kilo under circumstances similar to the instant case, Sergeant Nope conducted his own independent comparative analysis of the team, concluding that the team functioned appropriately together.[5] Sergeant Nope testified that, in his expert opinion, both Kilo and Trooper Taylor were very well trained and proficient in drug detection.

In relation to the deployment at issue in the instant case, after having reviewed the

---

[5] A video recording of that analysis was received as Government Exhibit 15.

videotape of the stop, Sergeant Nope testified that Trooper Taylor and Kilo acted in accordance with their training and accepted standards. He further testified that Kilo definitely indicated for the presence of drugs, that Trooper Taylor never cued Kilo to indicate, and that Kilo is not prompt-dependent.

Sergeant Todd Hull heads the UHP canine program. He is a certified canine handler, trainer, and judge. In his capacity as a judge, he certifies almost all service dogs in the state of Utah. In over eleven years, Sergeant Hull has acquired extensive in-service training and practical experience, including over 5,000 hours of narcotics detection work with service dogs. Sergeant Hull has provided expert testimony in the area of dog indication and behavior on at least 70 occasions.

In addition to his expert witness qualifications, Sergeant Hull also has extensive personal experience working with Kilo. Sergeant Hull trained with Kilo for over 400 hours, certified together with Kilo, and worked with Kilo as a drug detection team for over 20 months. Moreover, Kilo certified with each of his four handlers and he never failed to certify. Sergeant Hull viewed Kilo in training on many occasions and has never formed any concerns about the dog's meeting performance standards.

Sergeant Hull opined that Kilo is a well-trained and highly reliable drug detection dog with a very sensitive nose. In comparing Kilo to the other dogs which he certifies, Sergeant Hull characterized Kilo as being in the top echelon of drug detection dogs in the state. Kilo possesses a drug detection sensibility much more acute than the average dog, and Kilo rates as a top performer among all dogs in the program. Kilo boasts an outstanding track record of highly

reliable performance over many years and with multiple handlers. He further concluded that

Kilo is not a prompt-dependent dog.

Similarly, Sergeant Hull has worked and trained together with Trooper Taylor on many

occasions. Sergeant Hull assigned Kilo to work as a partner with Trooper Taylor because of their

complimentary styles. Sergeant Hull has trained with Trooper Taylor and Kilo as a team on

many occasions, and he participated in the certification of Kilo and Trooper Taylor as a drug

detection team. Sergeant Hull testified that Trooper Taylor is a well-trained and reliable canine

handler. After viewing the video tape of the sniff at issue in this case, Sergeant Hull opined that

Taylor and Kilo acted in accordance with their training and appropriate standards, that Kilo did

indicate for the presence of drugs, and that Kilo was not cued to indicate.

Finally, the defendant called Steven Nicely as a witness at the hearing. Mr. Nicely

worked as a police officer canine handler over 35 years ago and he has not worked in law

enforcement in over 20 years. Mr. Nicely worked for approximately 15 years as a dog trainer for

a private security company. In that capacity, Mr. Nicely held no certification and was not subject

to any peer review evaluation of his competency. Mr. Nicely holds no certification as a canine

judge.[6]

Mr. Nicely testified that the use of canines by law enforcement is a scientifically reliable

---

[6] In so finding, the court does not suggest that Mr. Nicely is not qualified as an expert. Mr. Nicely certainly has expertise in this area, and this court has previously credited the testimony of Mr. Nicely over the prosecution's canine expert in a different case. Given the circumstances of the instant case, however, the court credits the testimony of the government's expert, Sergeant Wendell Nope, over that of Mr. Nicely.

investigative technique and that dogs have dramatically more acute sense of smell than humans. Mr. Nicely further conceded that dogs can be trained to reliably identify certain odors, including controlled substances and if the dog and the handler are properly trained and follow the appropriate protocols, one can assume a reliable result.

Mr. Nicely admitted that he does not know Kilo, has never trained Kilo, has never observed Kilo in training, does not know Trooper Taylor, has never trained with Trooper Taylor, and has never observed Trooper Taylor in training. Mr. Nicely further conceded that in reviewing the performance of a dog for purposes of rendering an opinion on reliability of the dog that it is helpful to be familiar with the dog, to know the personality of the dog, to have viewed the dog in training, to have trained with the dog, to know the dog's handler, to have observed the handler in training, and to know the relationship of the handler and the dog.

Nevertheless, after watching the video tape of the traffic stop at issue, Mr. Nicely either inferred or directly opined at the hearing that Utah POST training was insufficient, that Kilo was improperly trained, that Trooper Taylor was improperly trained, that Kilo is prompt-dependent, and that Trooper Taylor cued Kilo to indicate for the presence of drugs on the date in question.

While Mr. Nicely's testimony was helpful and compelled the court to carefully consider Kilo's reliability concerning this particular search, the court credits the testimony of Trooper Taylor, Sergeant Nope, and Sergeant Hull over the testimony of Mr. Nicely. These three law enforcement officers offered credible testimony about Kilo's frenetic personality, which affects his searching style; his training and reliability record; and his reliable alert and indication during the traffic stop at issue here. This testimony was based on their extensive personal knowledge of

and interaction with Kilo, which Mr. Nicely lacked.

## CONCLUSIONS OF LAW

**I.     Trooper Taylor Lawfully Stopped the Truck Driven by Defendant Based on Probable Cause That Defendant Committed a Traffic Offense.**

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995).   In the instant case, sufficient justification existed to stop and detain the defendant for driving in excess of the posted speed limit. Utah Code Ann. § 41-6a-601 (a person may not operate a vehicle at a speed greater than the posted speed limit).

**II.    The Scope of the Detention Related to the Traffic Stop Was Lawful, and the Dog Alert Occurred Within the Scope of the Legitimate Detention**

Generally, in a routine traffic stop, an officer may detain persons for only as long as it takes to request an operator's license and vehicle registration, run required computer checks, and issue a citation. *United States v. Williams*, 271 F.3d 1262, 1267-68 (10th Cir. 2001); *United States v. Martinez*, 983 F.2d 968, 974 (10th Cir. 1992) (citing *United States v. Guzman*, 864 F.2d 1512, 1519).   However, the subject may be detained "until [the officer is] assured that the driver's license is valid and the driver is legitimately operating the vehicle." *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995) (citing *Guzman*, 864 F.2d at 1519).   Moreover, an officer may order a detained motorist out of the vehicle during a routine traffic stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).

In the instant case, when the trooper pulled over the defendant for a speeding violation,

the trooper discovered that the defendant did not have a United States driver's license and the defendant was not the registered owner of the truck.  The truck was registered in Arizona, but the defendant advised that he resided in and was traveling from Mexico.  The defendant produced a Mexican driver's license.  While speaking to the defendant at the truck (and even before he arrived at the truck window), Trooper Taylor noticed that the truck smelled strongly of air freshener.

Based on the trooper's past experience, individuals transporting illegal drugs often use strong air fresheners to mask the odor of drugs, and drug couriers often drive vehicles registered to a third party.  Additionally, Trooper Taylor knew from his training that the vast majority of illicit drugs in this country come from Mexico.  The totality of those circumstances raised suspicion to Trooper Taylor that the defendant may have been involved in drug trafficking.

In *Illinois v. Caballes*, 543 U.S. 405, 408 (2005), the Supreme Court held that, where officers did not extend the time necessary to resolve a lawful traffic stop, the use of a narcotics detection dog to sniff around the exterior of the car did not infringe the motorist's Fourth Amendment rights.  Because Trooper Taylor conducted the dog search within the scope of the legitimate investigation of the driving offense, the dog's review of the exterior of the truck did not extend the scope of the detention.  Therefore, the probable cause that developed as a result of the dog's detecting the presence of drugs constituted a valid basis to search the truck.

Alternatively, at a minimum, the facts of the instant traffic stop formed a reasonable suspicion that the defendant was engaged in criminal activity such that a legitimate basis existed to further detain him to investigate.  The Tenth Circuit noted in *United States v. Villa-Chaparro*,

11

115 F.3d 797, 801 (10th Cir. 1997), that "an investigative detention may be expanded beyond its original purpose . . . if the detaining officer acquires 'reasonable suspicion' of criminal activity, that is . . . the officer must acquire a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'"

As indicated above, reasonable suspicion existed to detain the defendant, even absent probable cause for his arrest. Such a detention may continue for a time reasonably necessary for the police to confirm or dispel the suspicion. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Therefore, even if the dog sniff extended the scope of the original detention, the circumstances warranted a further detention.

### III.     Kilo's Alert Constituted Probably Cause to Search the Vehicle

Under the Fourth Amendment, "police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo,* 500 U.S. 565, 580 (1991); *United States v. Clarkson*, 551 F.3d 1196 (10th Cir. 2009). The Supreme Court defines probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In the instant case, a trained service dog detected the presence of drugs in the defendant's truck by merely circling the exterior of the truck. The Tenth Circuit "has consistently held that probable cause can be based on alerts by trained dogs." *Clarkson*, 551 F3d. at 1203 (quoting *United States v. Kennedy,* 131 F.3d 1371, 1378 (10th Cir. 1997)). It has further indicated the narcotics dog must be "reliable" or "trained" in order for an alert to support probable cause. *See*

*Clarkson*, 551 F.3d at 1203. "A dog alert might not give probable cause if the particular dog had a poor accuracy record." *United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009)(citing *Clarkson*, 551 F.3d at 1203)). There is no evidence that Kilo had a poor accuracy record or that his certification was ever revoked. Therefore, the court finds that Kilo was adequately trained and certified as a drug-detection canine.

Defendant argues that the court should suppress the drug evidence contending that the government failed to establish a sufficient basis of reliability for the dog. To the contrary, the government did establish that the dog passed a rigorous training and certification process and demonstrated an excellent history of reliability.

More importantly, however, once the government made a showing of the dog's training and certification, the burden shifted to the defendant to prove the unreliability of the dog. *See United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) (stating "party seeking to suppress evidence bears the burden of proving the dog is unqualified"); *United States v. Moore,* 22 F.3d 241, 243 (10th Cir. 1994).

However, a less-than-perfect success rate does not undermined a dog's reliability. In *Illinois v. Caballes*, the Court referenced statistical evidence that proved a "reliable dog that alerts hundreds of times will be wrong dozens times." 543 U.S. 405, 412 (2005). In holding that a dog's reaction may provide probable cause to search, the Court noted that "the Fourth Amendment does not demand certainty of success to justify a search for evidence or contraband." *Id*. at 413. In this case, the court finds that Kilo's reliability record is more than adequate.

In an attempt to undermine Kilo's reliability, the defendant relies exclusively on the

testimony of Mr. Nicely.  However, because of his lack of observation and association with Kilo and Trooper Taylor, Mr. Nicely lacks the requisite foundation to render a reliable and informed opinion.  Finally, all three highly credible government witnesses, each of whom possesses extensive personal experience with Kilo, all refute Mr. Nicely's assertions.

Therefore, as the defendant failed to carry his burden of impeaching Kilo's reliability. The court finds that Kilo's sniff search of Mr. Gutierrez-Ruiz's vehicle on February 14, 2010 resulted in a reliable alert and indication of illegal contraband sufficient to provide probable cause to search the vehicle.

## CONCLUSION

Based on the above reasoning, IT IS HEREBY ORDERED that Defendant's Motion to Suppress is DENIED.

DATED this 13th day of January, 2011.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge